The case for oral argument is 23-3013, United States v. Tao. Mr. Dearington. Good morning, your honors, and may it please the court. Mike Dearington on behalf of defendant appellant Dr. Franklin Tao, and I'd like to reserve two minutes for rebuttal if I may, your honors. Dr. Tao, a tenured professor of engineering at the University of Kansas, or KU, was convicted on count nine for allegedly making a false statement in an internal University of Kansas institutional responsibilities form, an alleged violation of 18 U.S.C. 1001A2. He was accused of omitting a professorship that the government contends he took a few months before the form was allegedly completed. The evidence on count nine was insufficient as a matter of law, and the conviction must be reversed for several reasons. First, the KU form was not a matter within the jurisdiction of the executive branch of the U.S. government. Under Supreme Court precedents, including Rogers and Bryson, an agency has jurisdiction only over matters, quote, confided to the authority of the agency, such that the agency has the, quote, power to exercise authority in the particular situation, which here is the KU form. Do we look at the CFR to get some guidance here as regards conflict of interest and what KU needed to gather in order to satisfy these two agencies as regards conflict of interest? Your Honor, the answer is no, because when the defense sought to introduce a regulation, a set of regulations, the government objected. And the basis for their objection is quite interesting here, because it was on, one, relevance grounds, and two, the government contended that it was law and therefore not appropriate as evidence. And Your Honors will notice that the government's primary argument for jurisdiction in its brief, they say is, quote, the most relevant in this case is the OMB regulation that the trial prosecutors successfully objected to when we sought to introduce it and excluded it, including they made an objection on relevance grounds. The OMB, you mean the Paperwork Reduction Act arguments? No, Your Honor. So there's two sets of regulations, I suppose, at issue with respect to your question, as I understand it. So the primary evidence they relied on was what? So on appeal, for the first time, they're citing an Office of Management and Budget regulation that says that agencies should maintain conflict of interest policies. Right. Separately, we maintain that the district court improperly foreclosed us from raising a Paperwork Reduction Act defense, which is separate. It both involved OMB, but these are discrete issues and discrete sets of regulations. So the government's primary basis for jurisdiction on appeal, which is not raised below and not only not raised below, but deliberately waived, they successfully objected to excluding the very regulation they're attempting to rely on here. And so what does that mean for us? We should ignore it? Yes, Your Honor. If the regulation had been properly introduced, which in fact the defense sought to do, we would have made argument. We would have introduced testimony to show that that regulation does not embrace the alleged omissions in the conflict of interest form. And one reason for it, just by way of example, Your Honors, is that the regulation doesn't cover an employee's statements to a university. The regulation at best would cover the agency's conflict of interest forms and ensuring that the university complies with the agency's conflict of interest policies, which KU did here. So the Supreme Court and the Tenth Circuit on the issue of jurisdiction have found agency jurisdiction in two circumstances under the standard in Rogers. First, where there is a statutory basis for the agency's jurisdiction, exercise of authority over the matter in which the statement is made. This was the scenario in the Supreme Court's decisions in Rogers, in Bryson, in Jalilin, and in this Court's decisions in Wright and in Wolfe. And second, an agency has jurisdiction in some circumstances over a statement if it is part of a fraudulent application for undeserved federal benefits or funds. So that's the fraudulent invoice line of cases or the safeguarding of funds line of cases. The KU form here, between the employee and the university, meets neither of these two categories of 1001 cases and jurisdiction. The agency's had no statutory basis to exercise authority over Dr. Tao's statements in this form to his employer, KU. And the statements in the form were not a fraudulent request or part of a fraudulent request for undeserved federal funds. Our 1001 cases really project a very broad scope for the application of the provision. And I'm thinking of Wolfe in particular. We may not like it. It may seem overbroad. It may have some policy implications. But doesn't our case law really support a broad reading that might reach into the documents that arguably the government would rely on to make sure that their grantees are conflict-free? Your Honor, as an initial matter, Wolfe predates Rogers. So Rogers would be the Supreme Court decision that held the applicable standard. But even Wolfe itself involves the statement from Rogers that courts should not apply an overly narrow interpretation of 1001. I just want to start with that because I think Wolfe does say that. You have to remember that the context of that statement in the Supreme Court was whether the false statements to the FBI are within the FBI's jurisdiction. We were talking about extraordinarily narrow, as we know it now, given the decades since then and what we know about the statute, extraordinarily narrow interpretation. And there the litigants said, well, actually, it should just apply to quasi-judicial false statements when the agency is making a determination. Rogers and its progeny weren't saying that in every case we should apply the broadest reading of this. And in fact, the 11th Circuit and the 9th Circuit have cautioned that that would be an improper reading in circumstances like this one. Blankenship said that that would be an unbridled reading of 1001. Faccini, the 9th Circuit en banc, said that it would, without having a statement that's directly related to an authorized function of the agency, virtually limitless 1001 would be over statements made peripheral to the agency functions. And so coming back to your question about Wolf, Judge Tinkovich, Wolf involved a set of facts where there was a DOE requirement under regulations that a refiner and a seller use certifications that were expressly required by the regulation. And the seller passes the certification on to the refiner and the refiner passes the certification on to the DOE. And that directly affects federal entitlement benefits under the regulation, which is also pursuant to a specific statute. The court didn't get into the specific statute, but there is a statute that the regulation was promulgated under. And so you have a statutory regime that required, by regulation, a specific certification that was false in that case. Wolf did not mean to stretch beyond the authorized functions of the agency because that would have been contrary to Bryson and Supreme Court, later Supreme Court, precedent in Rogers. And I think Wright, the Supreme Court, the Tenth Circuit's decision in Wright would be a more recent iteration of when these, when a false statement is actually within a matter within the jurisdiction of the agencies. And I think that's a paradigmatic case of the stretches, the outer limits of 1001 jurisdiction, you might say, because it involved a statement that wasn't made directly to the agency. And those are the rare cases when you have a statement not made. But don't we have testimony here that the agencies very much relied on KU to get this information? Your Honor, actually, to be precise, the answer would be no. The testimony is that- Were they concerned at all about conflicts of interest before awarding these grants? Well, so, Your Honor- Were they? Were these agencies concerned about conflicts of interest before awarding grants? So, DOE, the evidence showed, apparently did not even have a conflict of interest policy. Alicia Reed said she was the research person at KU, said she was unaware of one. The one DOE witness, Schwartz, didn't talk about a conflict of interest policy. There was no evidence of a conflict of interest policy by DOE. NSF had a PAP guide policy. And I'd like to just footnote for a moment that a policy cannot create jurisdiction. Agencies are creatures of statute. There has to be an actual statute that they're operating under. An agency can't define its own jurisdiction by policy. But even if the policy were relevant, the PAP guide policy had no connection to the statements that are allegedly false here. The PAP guide specifically said that we want to know only about financial conflicts of interest, so not time commitments. That's half of the alleged false statement here. Financial conflicts of interest with a particular NSF grant. And Dr. Kaiser from NSF gave an example of that. If you had a researcher, and it has to be more than $10,000, I should say, as well, the financial conflict of interest. So an example of that given by the NSF, sole NSF witness, Dr. Kaiser, was that if you had a researcher who studies cancer research, and they're being funded more than $10,000 by Big Tobacco, then NSF would want to know about that. The district court's done away with that line of argument for the prosecution and focused only on the time conflict. So address that. Your Honor, you're absolutely right. So the district court's sole basis for upholding the element of jurisdiction here was that Dr. Tao allegedly had a time commitment. So there are a lot of problems with that, and I could go down and tick past each of the elements. But since we're talking about jurisdiction, I'll stick with that one for now. Well, kind of tie in the materiality, too, because the district court concluded that that omission was a material falsity to the government. Absolutely, Your Honor. I can address both in turn. So as to the jurisdiction point, even if we are, arguendo, treating an agency policy that it promulgates each year and that changes and isn't tied to the actual specifics of its conflict of interest, aren't tied to an actual statute, even if we're addressing that, there's no time commitment policy in the PAP Guide, no conflict of time issue. The most the PAP Guide has is a glancing, I suppose a reference to current and pending support, which is included in a proposal submitted directly to the agency. What about the regulations? Is there any time commitment in the regulations that I know you have here? They were excluded, but do they give us any guidance on that? No, I don't believe so, Your Honor. And on top of that, the district court correctly found that there was no capacities in the language, the argo of the agencies. There was no capacity issue here. So you have a policy that doesn't even involve time commitment conflicts. Who said there was no time capacity? I believe the district court said that there was no evidence of duplication of grants, capacity, or overlap. But the district court did find that time was used by the defendant at FZU, right? So the district court didn't go far enough. The district court stopped at saying a reasonable jury, and we think this is incorrect, but a reasonable jury could find that you had a time commitment under the KU form, and maybe you should have disclosed that to KU, and they could decide whether that's a time conflict under KU's policies. It would not translate to a conflict of time under NSF policies because there is no such thing. All they look at is at the time of a grant proposal directly to the agency, whether there are grants that take up too much of your time, and that wasn't an issue in this case. That's not an issue in Count 9. There were no— Can you move on to materiality while you still have a little time? Yes, Your Honor. So as to the materiality issue, and I'm happy to answer the specific question Judge Timkovich asked about the time commitment, or I can start writ large about the materiality issue. So materiality generally, the Tenth Circuit requires, for example, under Judge Briscoe's opinion in Finn, three parts to meet the materiality test. There has to be a state— the wise usage of our grant money. Actually, Your Honor, the government witness that the government cites to in their brief was talking about current and pending support in a grant proposal submitted to the agency, which is not at issue here. The government witness seemed actually taken aback when defense counsel asked her about the conflict of interest form, as though Dr. Kaiser was unaware that there was such a form. Defense counsel asked her on cross about the form, and she said, what, do you mean the policy? And defense counsel said, well, we'll start there. Is the policy submitted to the agency? And she said no. And then he said, is the form submitted to the agency? And she said no. I have no reason to think that NSF has ever seen such a form. Wasn't there some testimony, and I'm thinking of Vivian Schwartz in particular,  Yes, Your Honor. Didn't they both testify that they didn't necessarily know what they would have done with that information or how it would have impacted anything if they had received it? They didn't receive any information about a conflict, but had they received it, it would have been relevant to duplicity and some other factors. But they couldn't say what it would have meant? Your Honor, that testimony was in relation not to the form. It was in relation to a grant proposal submitted to the agency, which is, I'd like to be clear, we're not talking about anything related to a proposal for funding here. This is not a form that was submitted to the agencies. It didn't request funding. And Dr. Schwartz actually said no, that's not my, from DOE, said no, that's not my purview. I don't care whether he has a second job. And I'll give you some rebuttal time, but if you could refresh me on kind of the factual piece. For purposes of count nine, what would have been the actual time conflict, if any, between this grant and Mr. Tao's performance of the scientific work? There is no time conflict, Your Honor. Dr. Tao, he was in Germany. He was in Germany during that time? He was in either Kansas or in China. He had a buyout in the spring semester, so he was permitted to research and to complete his work from abroad. There was no question that he completed all of his research to the satisfaction of the agencies. I would like to just add one. And what about, Kay, you didn't object to his, he had permitted leave or absences? Yes, Your Honor. He had a buyout that had been approved for the semester, which is a common thing. You get to focus on your research. You don't have to be on campus. Did he use grant money for the buyout? So, the NSF, there was a, I believe the testimony is that there was some NSF funding used for the buyout, but the KU witness on that subject said that's completely appropriate. He was doing NSF research, and there's nothing that forbids that. Was there any testimony about what would have happened with these agencies had they received this information about the conflict of interest? Your Honor, there is no testimony that if the agencies had received this information, they would have done anything with respect to his funding. And I believe the district court even expressly stated that in its opinion. I'd like to, on the materiality point, it's not just that this form stayed at KU and that KU, had they received the alleged information that they said they should have had, never would have had any reason or requirement to provide it to the agencies. But the government didn't even identify a decision at trial to which this form was allegedly material. That's game over right there. The jury had no decision before it. And on appeal, for the first time, the government alleged there was a funding decision and that the alleged omissions were relevant and material to a funding decision. They didn't even identify the funding decision, and the reason is obvious. There was no funding decision. After September 25, 2018, when the form was allegedly completed, there were no decisions to be made, no proposals. Well, this was an ongoing requirement, right? He filled out a form and he was supposed to update it should there be changes, and it was an annual updating or requirement. Even, I suppose, if you had something occur before the annual requirement, you should be updating it and telling KU what you're doing and where you're doing it. But, Your Honor, the question is, is there an agency that actually has a decision before it to make and does? And this is under the three-part standard. Well, he had several grants, and this was an ongoing situation, was it not? Nothing had to be submitted to the agencies after this form was completed because only at the time of the proposal was current and pending support or your biosketch, which is like a resume, provided. So you would limit us to looking at which form for which date for which year? I would say that the government had a burden to identify a specific agency decision to which this form is material, and it never even tried. And even on appeal, it hasn't identified that. And the Supreme Court, a specific decision, the Supreme Court just this year in the Simonelli case said the government can't cherry-pick evidence if it's not its theory at trial on appeal and say that this court can affirm because there's sufficient evidence to support this alternative theory or this other decision that we're identifying for the first time on appeal. One point that I think is so critical here— Go ahead and wrap up. You're over time. Okay, and I appreciate, Your Honor, allowing me at least a brief rebuttal. The government changed its theory at trial. It knew that it had no jurisdiction of materiality. So it said in argument three times, the only identification of the false statement here, it said Dr. Tao caused KU to make a false statement. No one disputes that there was no such false statement. All right, let's hear from the government. Thank you, Your Honor. Mr. Minta. May it please the Court, Your Honor. Joseph Minta on behalf of the United States. Dr. Tao attempted to secretly juggle two full-time jobs. This court should affirm his conviction based on the lies attempting to hide his second full-time job at Fuso University.  may I ask you to please stand and be recognized. from Kansas University and as federal funders as based on sufficient evidence. I'd like to start with the jurisdiction element as well. Could you go straight to Judge Robinson's order at page 56? She spent less than a page finding that there was materiality in this case. And the first finding she made was, it's true that NSF never sees a principal investigator's KU forms. And there is no evidence that had Tao disclosed his foreign activities to KU, KU would have disclosed this information to NSF. Nevertheless, she goes on. Why don't we stop there? If the government didn't put on any evidence that had Tao disclosed his foreign activities to KU, it would have made any difference at all that they would have even disclosed that. How do we even get to whether the agency was making a decision, or would have made a decision, or would have impacted a decision, if there isn't even any evidence they would have ever known about it? Yeah, that's because the agencies delegated that responsibility to KU to manage the conflicts. KU would then report to the NSF or to the DOE if they had a conflict that they felt wasn't manageable. I understand all of that. I'm understanding all that. But there's no evidence that they would have disclosed this had he revealed it. Because KU then would have taken the next step of attempting to determine could they manage those conflicts. Judge made this finding, that there wasn't any evidence that they were going to give the agencies this information. I think implicit in that finding is that KU- Yeah, tell me what's implicit, and how do I read implicitly into materiality and element of the offense? Yes, Your Honor. I think implicit in that is that KU would have undertaken the process to manage Tao's conflict with Fuso University if it had been disclosed. If that management was successful, then they're compliant with NSF regulations by allowing him to continue that research. I don't see that anywhere. I see two paragraphs on materiality, and what we're looking at are the district court's findings here. Your Honor, I think the materiality analysis here- I think there's a failure of evidence here. There's also no evidence that had it been given to the agencies, there's no evidence of what they would have done with it. Your Honor- Or what decision that it pertained to. I think on the second question, I would point to Dr. Kaiser's testimony at page 1111 of the record, where she says that the program officer would then have to undertake the analysis to determine whether or not the research should go on, given that information. That's not testimony that in this case, it was material to a decision made by the agency. That is not testimony. And Judge Robinson didn't suggest that it was. I think the materiality analysis here is very similar to that in this Court's decisions in Wright and in Muley. In Wright, the form and the information was submitted only to a state agency. That was the State Water Regulatory Agency. There was no requirement that the State Water Regulatory Agency pass that information along to the EPA. They were just delegated responsibility to manage clean water standards in their district. Nonetheless, this Court affirmed the conviction because the state agency was given false information that made them continue to allow that water treatment plant to continue operating. There was no information that would have been passed to the EPA, and yet it was found material because the state agency had been delegated that responsibility to manage that issue. And they were given false information. And they were given false information. How does that compare to this? So here, the National Science Foundation and the Department of Energy delegated responsibility to KU, and KU was given false information about TAO's confidence. And that's through these regulations? How did that get delegated? So every time a grant is awarded, one of the conditions of that grant is that the university agrees to manage its researchers' conflicts. The way KU chose to do that was through these institutional responsibilities forms and its conflict of interest policy. So the way it was managing it and fulfilling that delegated duty was by requiring – The agency didn't instruct them how to fulfill that duty, did it? No, they did not.  But they were still required by the agency to fulfill that duty. But then there's also the requirement that they, for materiality purposes, that this make a difference, that this make a difference somehow to an agency decision. What was the decision that it made a difference to? The decision was whether to allow TAO to continue to expend funds from his grants. The NSF policy is explicit. Did anyone testify to that? Yes, and it's in the NSF policy that conflicts have to be managed at any point throughout the grant research process in order to – prior to the expenditure of any funds. And what was the testimony to support that, in this case, had they received this information about this internal form and what it disclosed, that it would have somehow impacted their management of the grant? What was the testimony? So nobody went that far, and that was part of – Isn't that a problem? No, Your Honor. I don't think that it is, because materiality only needs to be capable of influencing that decision. And here, both Drs. Kaiser and Schwartz did testify that it would have been capable of influencing. What did they say exactly? They said that they needed to know researchers' other obligations in order to determine issues of capacity, overlap, and duplication. It would have mattered what they learned and what other information was there. Yes. One of the things they would be concerned about is whether or not the research – Pardon? But they never learned it, so – Right. Because he never gave that information to KU, so KU could determine, can we manage this here, or do we need to disclose that to NSF in order to allow Tau to continue to use his NSF funds? That was what KU would have had to determine. Yes, but – Sorry. Let's say that had they received this information and considered the context and various other factors, is that – I mean, that it may have made a difference? Did they even say that? So they didn't talk about it in that particular timeline. I didn't see that. I didn't see that. But they did say that they needed to know this information. Dr. Kaiser is explicit that she would have wanted to know about Tau's other position at Fuso University. Would have wanted to know doesn't get you to materiality, though. Well, I think that the reason that she would have wanted to know that was in order to evaluate capacity, overlap, and duplication. These are the things that she's evaluating in examining research that they're funding. There's a lot of information that you might want to know. Say that a researcher contracts cancer and has to take a leave of absence or has some other family emergency that impacts the time commitment to a project. I mean, you can think of countless hypotheticals that the agency might want to know and could know may be useful. But the same thing with the time commitment here. There's no regulation that spells this out, right? And again, that's because KU was delegated responsibility to manage conflicts in their own manner. And they chose to do that. Well, it might suggest that the agency doesn't consider the information material if they don't bother to kind of give direction to their grantee agencies. So here I think there's two points. Again, KU was given the ability to manage conflicts in the way that they saw fit. And they did that through their conflict of interest policy, which is explicit that it's designed to conform to federal requirements. Does it matter here that they allowed Dr. Tao to take this leave of absence or to, you know, buy out the semester of his contract? I mean, was there really an actual time conflict here if he was given a permissive absence? No, Your Honor. I think it's important to talk about the permissive absence only allowed him to change his teaching responsibility time to additional research time. It didn't allow him to do research for another entity. It didn't allow him to have a second full-time job. He was still supposed to be a 100% employee for KU. The buyout only excused him from teaching, which was 40% of his time responsibility. And he used research funds in order to cover KU to hire another professor to do his teaching responsibility. Well, what evidence was there that the second position, if it occurred, affected his performance of this grant? So I think that there's two responses to that. First, there is testimony that Tao was not timely fulfilling his non-research obligations. He needed to be prompted to actually provide mentoring to the students he was supposed to be supervising at KU. And he also was failing to fill out the forms that the KU chemistry department needed in order to remain accredited. He eventually did do those things, but he needed to be prompted to do those things. But more importantly, I think that a lot of these arguments go to an attempt by Tao to introduce an element of loss into Section 1001, which just isn't there. There doesn't need to be a loss to the university in order to sustain a false statement conviction. And that goes to the fraud charges that the district court dismissed. Again, as Judge Briscoe suggested, it's kind of an annual update. If he's taken a second job during one year of the grant, maybe the next certification is going to be the false statement. But here it sounds to me like there was no false statement at the time of the certification because there had been no time conflict yet. Is that incorrect? I do think it is incorrect, Your Honor. He had taken the position in May of 2018. Throughout that summer, he's recruiting researchers to come join his team at Fuso University. He's applying for research grants from the Chinese government. He's building a laboratory at Fuso University. And then in December, after the September form is filed, he does then move to China essentially and take a greater time. Is there evidence that that time commitment interfered with his performance of the NSF grant? So I don't think that it needs to interfere with his performance of the NSF grant. Why not? The reporting requirement was that it was a professional obligation related to his responsibilities at KU. And the Fuso University contract that he signed definitely meets that requirement. Can I move to the jurisdiction also? Say Dr. Tao had recruited a graduate student to work on this NSF contract and that grad student gave false statements to Dr. Tao and then Dr. Tao omitted statements because that hadn't been disclosed to him in the institutional reporting form. Would that grad student have committed a 1001 felony? I think you'd need to add additional elements to that in order to satisfy the other parts of 1001. In particular, I think materiality would be an even greater challenge here than the questions that you've been asking. Here we have Drs. Kaiser and Swartz testifying that they would have wanted to know this information. I don't know whether they would have- Let's say the grad student was the right hand man to the doctor. Let's assume materiality. Is that a 1001 crime? You still additionally need willfulness. You would need things like the reported phone calls. Assume that. It could be right. I think it comes down to properly defining what the matter is here. The matter, as this Court's decisions in Wolfe and Wright make clear, is broader than the particular paperwork involved. In Wolfe, the paperwork were these private contracts between two non-government entities. But the matter was the entitlement program underlying the prices in those contracts. In Wright, the paperwork were water quality reports that were sent only to state agencies. But the matter was the broader EPA regulation of clean water standards. So I think defining the matter- The purpose of my question, I'm looking for a limiting principle here, frankly. It's an important case, and it really squarely draws some of those issues. In the Levin-Cirkin and Blankenship, that case explored some of the problems with the overbroad or the outer contours of this statute. And this case seems to push up against those outer boundaries for some of the reasons you're exploring with Judge Moritz. How do we write an opinion that basically doesn't sweep in the grad student in a minimum wage committing a crime? I think that affirming in this case is entirely consistent with Blankenship, and that Blankenship can provide some guidance as to that limiting principle. I think it's helpful to think of the jurisdiction analysis as having two parts. The first is identifying the matter involved, and then the second is examining the agency's authority over that matter. Blankenship is really focused on that second part, and that, I think, is where those limiting principles can come in. But Tao's argument is really focused on the first part and claiming that the matter is simply the institutional responsibilities form. And Blankenship doesn't really go to that question. And the matter, and to you, the matter is what? The matter is his federally funded research. That's what the Kansas KU, the KU conflicts policy says. This is designed to conform to federal regulations governing research. That's what makes this form, that makes the matter that this form is made in part of federally funded research. And if the matter is, instead, the form itself or KU's governance of the form, then you would lose on that because clearly the agencies have no jurisdiction over KU's internal use of that form. So, again, I think that Wolf and Wright show that the matter has to be broader than the paperwork involved. I think you could also think about essentially, you know, examining whether the FBI has jurisdiction over the coffee shop where they conducted an interview. The way that a particular statement is made isn't the matter. We have to look more broadly. And that's the Supreme Court's direction in Rogers, that the jurisdiction element is supposed to be broad. In order to avoid a lot of the hypotheticals in Blankenship, again, I think materiality and willfulness are the way to do that. Most of those hypotheticals don't involve those additional facts. And that's why, that's because Blankenship was purely focused on the jurisdiction. Why was the misconduct here material? Again, Your Honor, the misconduct was material, or the misstatement was material because it was capable of influencing the agency's decision to allow him to continue to expend funds. Because they wanted to evaluate a researcher's capacity, duplication, and potential overlap with other research that was being funded from other entities like the Chinese government or Fuso University. Thank you. Could you give two minutes for rebuttal? Thank you, Your Honors. I'd like to address the materiality point first. Just to level set, there was no conflict of interest or time. And NSF and DOE weren't even interested in conflicts of time. They had a proposal section about current pending support. Dr. Tao, truthfully, listed his current pending support. It's not even at issue right now. My friend here, I think, made a telling admission when he said nobody went that far in response to Judge Moritz's question about whether the steps two and three of the required test were satisfied here. I mean, we have to have a statement, which the government switched the statements at the end of the trial. But putting that aside, if they'd stuck to the indicted theory, you have to actually have an agency decision. And it has to be capable of influencing that decision. And my friend here said nobody went that far. They just had a statement and some innuendo about which, by the way, Ms. Schwartz, Dr. Schwartz from DOE, didn't say she was interested in whether he had a second job. Dr. Kaiser found that might be interesting in the context of talking about a grant proposal, not about a conflict of interest form or an institutional responsibilities form. It was material to get the grant. They were concerned about how their monies would be spent. Were they not? So, Your Honor, if there had been a current pending support disclosure that had to be made, Dr. Tao made it. There was no finding or issue in the case that he didn't do that. Was there an ongoing requirement? No, Your Honor. Only annual. So you look at this annual. You can do anything in the interim. It doesn't matter. Not even, Your Honor. There's a proposal that's submitted, and once the agency approves it for funding, right before that they may ask for a refresh or something. Now it's funded and you submit progress reports each year. You don't have to submit more current pending support or more biosketches with each one of those. Was there any testimony about that? Because I understood from the government there was an ongoing monitoring of conflicts of interest. Well, the government is talking about KU and what KU is doing. They're not talking about what NSF is interested in. That is important. So NSF didn't have, there was no testimony from either agency about any ongoing monitoring that they do of conflicts? No, Your Honor. In fact, the most that the government could argue here is that if there was an actual financial conflict of interest that Dr. Tao had that conflicted with an ongoing NSF grant, then KU just manages that, and if they can't manage it, maybe they have an obligation to check in with the agency about that. We're not even, we don't have that here. There's no evidence there was actually a conflict of interest here, and the government didn't even argue it below. They're arguing it for the first time on appeal that he actually had a conflict. If there was evidence of time usage, was there not, that he was doing other things when he was supposed to be a full employee at KU? So at the outset, Your Honor, I'd just like to clarify that we reject all of those factual characterizations of the evidence, and we address the reasons that those are distorted in our brief. But even if there was a time issue, that's not what NSF was interested in, and that's not what DOE was interested in. Remember, the only issue the NSF was interested in here was a financial conflict of interest with a grant, and there was not even an argument, let alone evidence below, that that existed here. And, Your Honor, Judge Timkovich, you asked about evidence that the grant was affected. There was no evidence. He was a stellar researcher, and my friend, I think it's telling, responded by talking about KU administrative duties. They had nothing to do with research, and that was all he came up with with how a grant might be affected. All right, I think your time's expired. We appreciate the arguments, and you may be excused. Thank you, Your Honors.